1998 ME 24

**BOARD OF OVERSEERS OF THE BAR**

v.

**Albert P.C. LEFEBVRE.**

Supreme Judicial Court of Maine.

Argued Oct. 9, 1997.

Decided Jan. 29, 1998.

Karen G. Kingsley, Assistant Bar Counsel (orally), Board of Overseers of the Bar, Augusta, for plaintiff.

John C. Bannon (orally), Michael D. Traister, Murray, Plumb & Murray, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, and LIPEZ, JJ.

PER CURIAM.

[¶ 1] Albert P.C. Lefebvre, an attorney admitted to practice law in Maine, appeals from an order of a single justice of the Supreme Judicial Court (*Glassman, J.*), acting on a two count information filed by the Board of Overseers of the Bar, finding that

**70**

he violated several provisions of the Maine Bar Rules, and suspending him from the practice of law for eight months. Lefebvre contends *inter alia* that the court made clearly erroneous findings of fact; erred by concluding that he violated the Bar Rules; denied him due process of law by ruling on issues beyond the parties' stipulation of issues; and violated his free speech rights by sanctioning him for the content of his speech. We affirm the order with respect to count I of the disciplinary information. Because, in sanctioning Lefebvre for the conduct described in count II, the court went beyond the issues the parties stipulated as being before the court, we vacate the order with respect to count II.

## I.

*Representation of Muriel Crocker*

[¶ 2] Muriel Crocker, the sister of George Brunelle, was appointed as the personal representative of Brunelle's estate. Crocker hired Lefebvre to represent her in connection with the administration of the estate. Lefebvre told Crocker that his fee would not exceed $5,000.[1] Monies were collected from Brunelle's various bank accounts and deposited into an estate checking account. At Lefebvre's request, Crocker signed several blank checks and authorized him to co-sign checks drawn on the estate's account.

[¶ 3] Lefebvre prepared an undated, single-page accounting of the estate. The document, signed by Crocker in her capacity as personal representative, showed a zero balance in the estate and contained the following type-written language: "Distribution of checks January 27, 1993 as above." The accounting listed $7,926.41, or 5% of the value of the estate, as Lefebvre's legal fee. Although there was some question about the purpose of the document, Lefebvre testified that it was his "final report" to Muriel Crocker and the beneficiaries.

[¶ 4] Concerned that this accounting did not reflect her understanding of Lefebvre's fees and the amounts to be distributed to the beneficiaries, Crocker requested from Lefebvre a clarification and all checks representing disbursements from the estate. When Lefebvre did not respond, Crocker retained another attorney. That attorney informed Lefebvre that Crocker's primary complaint was that his $7,926.41 fee was excessive and requested a statement for legal services rendered. Lefebvre did not respond. Crocker obtained copies of cancelled checks from the bank and discovered that four checks had been deposited in Lefebvre's account. One of the checks was dated March 3, 1993. The checks totalled $13,379.22, an amount not shown on the final accounting.

[¶ 5] Crocker filed a complaint against Lefebvre with the Board and a petition for fee arbitration. *See* M. Bar R. 3.3(c). In connection with the arbitration, Lefebvre prepared an itemized statement of his services, something he had not done previously. A panel of the Fee Arbitration Commission found that there were no novel or difficult questions in settling the estate, although there were disputes between beneficiaries concerning some items of personal property. The panel determined that a fair and reasonable compensation for the services rendered by Lefebvre was $3,000. *See* M. Bar R. 9.

*Rice v. Lefebvre litigation*

[¶ 6] For several years, Lefebvre has been embroiled in a boundary dispute with his neighbor, June Rice, and her late husband Dr. Robert Rice. Mrs. Rice brought an action for trespass and damage to her property against Lefebvre in the Superior Court. Following a nonjury trial, the court (*Fritzsche, J.*) found that Lefebvre had intentionally trespassed on Rice's land, damaged her fence, and harassed her. In August, 1993, the court entered judgment for Rice, awarded treble damages and attorney fees, and

1. Lefebvre testified that the beneficiaries of the estate "kept pressing" for a fee calculated as a percentage of the estate. He also testified that, despite his awareness of a case prohibiting percentage fees in estate matters, *see Estate of Davis*, 509 A.2d 1175 (Me.1986), he quoted a percentage fee "to try to work with the family." The court did not find, and we need not decide, whether Lefebvre charged an illegal percentage fee in connection with his representation of Muriel Crocker. As discussed below, the court's conclusion that Lefebvre collected an excessive fee in violation of M. Bar R. 3.3(a) is amply supported by the record.

assessed punitive damages as a result of Lefebvre's "very malicious conduct." [2]

[¶ 7] Attorney S. James Levis represented the Rices in the protracted litigation with Lefebvre. In a May 1, 1995 letter to a local attorney, Lefebvre accused Levis of stalking him and concluded "that there is a developing law theory which can be called legal stalking based on Mr. Levis' conti[n]uing representation of [the Rices]." Lefebvre sent copies of the letter to Governor King, Attorney General Ketterer, several members of the Maine Senate, the mayor of Biddeford, and the Biddeford building inspector. Lefebvre also wrote a letter to Attorney General Ketterer, dated June 21, 1995, stating:

> It has been suggested that the "Punishment Order" of Justice Fritzsche bears the marks of a pay off. The Order is primarily a payment to the opposing attorney, James Levis, Jr. Esq. whose law firm represented both, the Plaintiff Rice and the City of Biddeford, and does not cite constitutional or case law.... The matter of the financial punishment should be investigated and reverse[d] as in the best interest of all Maine citizens.

Levis obtained a copy of Lefebvre's May 1, 1995 letter and forwarded it to the Board.

[¶ 8] Pursuant to M. Bar R. 7.1(e), a panel of the Grievance Commission held a public disciplinary proceeding concerning Lefebvre's conduct. Pursuant to Rule 7.2(b)(7), the Grievance Commission authorized Bar Counsel to file a disciplinary information. The first count of the information, relating to Lefebvre's representation of Muriel Crocker, alleged that Lefebvre violated Maine Bar Rules 3.1(a) [3]; 3.2(f)(2), (3), and (4) [4]; 3.3(a) [5]; 3.4(f)(2)(ii) [6]; and 3.6(a)(3).[7] The second count, relating to the Rice litigation and the accusations against Justice Fritzsche and Attorney Levis, alleged that Lefebvre violated Maine Bar Rules 3.1(a); 3.2(c)(2), (e)(1), and (f)(4) [8]; and 3.7(a).[9]

[¶ 9] The parties stipulated to the following issues for litigation: (1) whether Lefebvre charged Muriel Crocker an excessive fee and whether his accounting was inaccurate; (2) whether Lefebvre purchased a safe from an estate that he represented; (3) whether Lefebvre took legally unreasonable positions and filed frivolous appeals in *Rice v. Lefebvre*; (4) whether Lefebvre observed allegedly unethical behavior by Attorney Levis, but did not report it to the Board; (5) whether Lefebvre accused Justice Fritzsche and Attorney Levis of conspiring and participat-

---

**2.** On appeal, we affirmed the judgment and sanctioned Lefebvre for filing a frivolous appeal. *Rice v. Lefebvre*, 644 A.2d 1032 (Me.1994).

**3.** M. Bar R. 3.1(a) provides that Maine Bar Rule 3, the Code of Professional Responsibility, is binding upon attorneys and that violation of Bar Rule 3 shall be deemed to constitute conduct "unworthy of an attorney" for purposes of 4 M.R.S.A. § 851 and M. Bar R. 7(e)(6)(A).

**4.** M. Bar R. 3.2(f) provides, in part, that a lawyer shall not:
> (2) engage in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
> (3) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;
> (4) engage in conduct that is prejudicial to the administration of justice.

**5.** M. Bar R. 3.3(a) prohibits a lawyer from entering into an agreement for, charging, or collecting an excessive fee.

**6.** M. Bar R. 3.4(f)(2)(ii) provides:
> A lawyer shall not directly or indirectly purchase property at a probate, foreclosure, or judicial sale in an action or proceeding in

which the lawyer or any partner or associate appears as attorney for a party or is acting as executor, trustee, administrator, guardian, conservator, or other personal representative.

**7.** M. Bar R. 3.6(a)(3) provides that a lawyer shall not neglect a legal matter entrusted to the lawyer.

**8.** M. Bar R. 3.2(c)(2) provides that a "lawyer shall not knowingly or carelessly make false accusations against a judge or other adjudicatory officer." M. Bar. R. 3.2(e)(1) provides that:
> A lawyer possessing unprivileged knowledge of a violation of the Maine Bar Rules that raises a substantial question as to another lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.

**9.** M. Bar R. 3.7(a) provides that "A lawyer shall not file a suit, assert a position, delay a trial, or take other action on behalf of a client when the lawyer knows, or should know, that such action would merely serve to harass or maliciously injure another."

ing in a bribery scheme. Not included in the stipulation were the discrete issues of whether Lefebvre had good moral character or had engaged in turbulent, intemperate, or irresponsible behavior.

[¶ 10] Following a hearing, the court concluded, with respect to count I, that Lefebvre had violated Maine Bar Rules 3.3(a), 3.4(f)(2)(ii), and 3.6(e)(2)(iii) [10] and had conducted himself in a manner unworthy of an attorney. With respect to count II, the court found that Lefebvre's May 1 and June 21, 1995 letters were intemperate, irresponsible and manifested a lack of the good moral character necessary for the practice of law. *See* 4 M.R.S.A. § 805–A (1989 & Supp.1997); *Sanborn v. Kimball*, 64 Me. 140 (1875). The court did not conclude that Lefebvre had violated any of the Bar Rules cited in count II of the information. This appeal followed. *See* M. Bar R. 7.2(b)(5).

## II.

[¶ 11] In an attorney discipline case, we review the inferences drawn by the court from the evidence presented at the hearing, and must uphold its findings of fact unless they are clearly erroneous. *Board of Overseers of the Bar v. Dineen*, 481 A.2d 499, 502 (Me.1984).

### Count I

[¶ 12] Lefebvre argues that the record does not support the court's conclusion that he violated M. Bar R. 3.3(a) by charging Muriel Crocker an excessive or illegal fee. We disagree. A fee is excessive "when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." M. Bar R. 3.3(a). Although Lefebvre initially estimated his legal fees for handling the estate at $5,000, he paid himself fees totalling over $13,000. A panel of the Fee Arbitration Committee determined that $3,000 was fair and reasonable compensation for Lefebvre's services. The record clearly supports the finding that Lefebvre charged an excessive fee and the conclusion that Lefebvre violated Rule 3.3(a).

[¶ 13] Lefebvre also challenges the court's conclusion that he violated M. Bar R. 3.6(e)(2)(iii), which obligates a lawyer to maintain complete records of a client's properties possessed by a lawyer and to "render prompt and appropriate accounts to the client regarding them." Lefebvre's records in connection with his representation of Muriel Crocker were neither promptly prepared nor were they appropriate. Lefebvre's "final report" listed $7,926.41 as his fee, although it appears that he had paid himself over $10,000 by January 23, 1993. The fourth check, in the amount of $2,124.85 and payable to cash, was deposited into Lefebvre's personal account sometime after March 3, 1993.[11] The record supports the court's findings that Crocker requested a clarification and copies of all checks representing disbursements from the estate, and that Lefebvre failed to respond. Further, Lefebvre concedes that he did not respond to a similar request from the attorney Crocker hired to look into the accounting of the estate. Crocker did not receive an itemized statement for Lefebvre's services until she filed a petition for fee arbitration. In these circumstances the court did not err by concluding that Lefebvre violated M. Bar R. 3.6(e)(2)(iii). Accordingly, we affirm the order with respect to count I of the information.[12]

---

10. M. Bar R. 3.6(e)(2)(iii) provides that a lawyer shall "[m]aintain complete records of all funds, securities and other properties of a client coming into possession of the lawyer and render prompt and appropriate accounts to the client regarding them[.]" Although the information did not allege a violation of Rule 3.6(e)(2)(iii), the parties' stipulation identified the manner of Lefebvre's accounting as an issue for litigation.

11. The evidence does not support the court's finding that the fourth check was dated approximately one week after the date of the "final report." Given the inadequacies of Lefebvre's record keeping, however, we are convinced that the error is harmless. *Lawton v. Richmond*, 1997 ME 34, ¶ 14, 690 A.2d 953, 956.

12. The court also found that Lefebvre violated the Bar Rules by purchasing a safe from the estate during the administration of the estate. Lefebvre recognized the safe as formerly owned by his grandfather and offered to purchase it for $50. Later, Crocker agreed to sell the safe to Lefebvre for $250. When George Brunelle's sister, Annette Brunelle, claimed ownership of the safe, Lefebvre negotiated the purchase of the safe with her attorney. An agreement was reached

*Count II*

[¶ 14] A disciplinary information filed pursuant to M. Bar. R. 7.2(b) is analogous to a civil complaint, *Board of Overseers of the Bar v. Rodway*, 461 A.2d 1062, 1064 (Me.1983), and for that reason, "absent surprise or other prejudice, the [court] may consider more than the specific sections of the Bar Rules cited in the information." *Id.* In this case, the court did not find that the Board had sustained its burden of proving by a preponderance of the evidence that Lefebvre had violated any of the Bar Rules cited in count II of the information. *See* M. Bar R. 7.2(b)(4). Instead, the court concluded that the accusations against Attorney Levis and Justice Fritzsche in Lefebvre's May 1 and June 21, 1995, letters were intemperate and irresponsible. *See In re Feingold*, 296 A.2d 492, 500 (Me.1972) (stating that "[t]urbulent, intemperate or irresponsible behavior is a proper basis for the denial of admission to the bar."). The court also concluded that the letters evinced a lack of good moral character and constituted conduct unworthy of an attorney. *See* 4 M.R.S.A. § 805–A(2)(A) (1989 & Supp.1997); M. Bar R. 3.1(a). We agree with Lefebvre's contention that, in the circumstances of this case, he did not have fair notice of the possibility that he would be sanctioned for lack of good moral character or intemperate or irresponsible conduct.

[¶ 15] The Due Process Clauses of the Maine and Federal Constitutions [13] require that an attorney must be given a hearing before he is deprived of the right to practice law on the ground that he lacks character and fitness. *Willner v. Committee on Character and Fitness*, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); *Board of Overseers of the Bar v. Lee*, 422 A.2d 998, 1003 (Me.1980). This requirement includes fair notice of the charges against the attor-

ney. *In re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117 (1968).

[¶ 16] In this case, following a pretrial conference, the court requested that the parties enter into a stipulation of issues for litigation. The parties filed the stipulation. There is no indication the parties waived the stipulation or otherwise consented to the court's consideration of issues beyond those in the stipulation. *Cf. O'Neill v. Williams*, 527 A.2d 322 (Me.1987) (stating that court's decree should be limited to issue as framed by the parties stipulation). Given that the issues were stipulated by agreement of the parties, Lefebvre did not have fair notice that he could be sanctioned on the basis of lack of good moral character. There is fundamental unfairness in predicating a sanction on the overarching requirement of good moral character, when lack of good moral character is not identified as an issue in the stipulation of the parties, and when the Board has failed to persuade the court with respect to violations that have been specifically alleged. Had Lefebvre known that his moral character would be evaluated by the court, he could have adduced evidence and constructed arguments to refute that theory of misconduct. The court's consideration of issues beyond the scope of the information and the parties' stipulation can constitute surprise. *Board of Overseers of the Bar v. Rodway*, 461 A.2d at 1064.[14]

[¶ 17] We recognize that modern pleading is not a "game of skill in which one misstep by counsel may be decisive of the outcome" of the case. 61A AM.JUR.2D *Pleading* § 3 (1981). We also recognize that litigants should be encouraged to enter into stipulations whenever possible. Nevertheless, when neither the information nor the stipulation explicitly designates the intemperate, irresponsible, or turbulent nature of the attor-

whereby Lefebvre paid $200 to the estate for the safe in exchange for the other beneficiaries' acquiescence in Annette Brunelle's claim to a desk in George Brunelle's house. Crocker and the other beneficiaries were informed of and agreed to the arrangement. Under these circumstances, any violation of the Bar Rules was *de minimis.*

13. Me. Const. art. I, § 6–A; U.S. Const. amend. XIV. The due process requirements of the Maine

and Federal Constitutions are identical. *See Fichter v. Board of Envtl. Protection*, 604 A.2d 433 (Me.1992).

14. We note that, at oral argument, the Board conceded that it was surprised that lack of good moral character was one of the bases for the sanction.

ney's conduct or the attorney's good moral character as issues for litigation, fundamental notions of fairness underlying the Due Process Clauses prohibit the imposition of a sanction on either basis.

[¶ 18] Further, we are unpersuaded by the Board's contention that its allegation that Lefebvre violated M. Bar R. 3.1(a) was sufficient to put Lefebvre on notice that his good moral character was at issue. Any such notice was superseded by the parties' stipulation, which governed the proceedings and limited the issues to be decided by the court.

The entry is:

Judgment affirmed in part and vacated in part. Remanded for a determination of the appropriate sanction related to count I of the information.

